# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00238-CV

**Denise Hicks, Appellant**

**v.**

**Falcon Wood Property Owners Association, Appellee**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 274TH JUDICIAL DISTRICT
### NO. 07-1965, HONORABLE WILLIAM HENRY, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

This appeal arises from disputes between a residential property owners association and one of its members concerning the association's interpretation and enforcement of restrictive covenants. The disputes escalated into litigation, and the association—appellee Falcon Wood Property Owners Association (FWPOA)—ultimately obtained a judgment against the individual property owner—appellant Denise Hicks—awarding it $150,800 in statutory damages, plus attorney's fees and permanent injunctive relief. Hicks appeals. In three issues, Hicks argues that the jury findings on which the judgment was based were immaterial or not supported by legally sufficient evidence. We agree with Hicks and will reverse the district court's judgment and render judgment that FWPOA take nothing on its claims.

## BACKGROUND

Falcon Wood is a residential subdivision with large, multi-acre lots that is located in Hays County, roughly halfway between San Marcos and Wimberley. Lots in Falcon Wood are burdened by restrictive covenants (the Restrictions) that have been recorded in the Hays County real property records. The Restrictions limit the types of structures that are permitted on each property principally to one "dwelling unit . . . to be used for residential purposes." This "dwelling" is required to have at least 1600 square feet of living area (excluding porches), consist of "new construction materials," have a concrete or pier and beam foundation, be served with water and electricity, and be "equipped with septic tank or other sewage disposal system meeting all applicable laws, rules, standards and specifications." Manufactured homes are not considered "dwellings," and the use of "a structure of a temporary character" as a residence is also prohibited in Falcon Wood. On the other hand, Falcon Wood property owners are permitted to have on their property, in addition to the authorized "dwelling," certain types of outbuildings, including guest houses, detached garages, and "work shops." Also, reflecting a semi-rural atmosphere, barns are allowed, and residents are even permitted to have one horse, cow, or goat ("as long as the animals do not become a nuisance or threat"), plus additional farm animals (excluding pigs or hogs) if being raised by the property owner for "4-H school sponsored programs."

The Restrictions are administered and enforced by appellee FWPOA, a non-profit corporation comprised of the subdivision's property owners. FWPOA acts through a board of directors that, the evidence suggests, is quite vigorous in discharging its responsibilities as it perceives them. The Restrictions also require prior approval by an "Architectural Control

2

Committee" of the FWPOA before any of the permissible types of dwellings, outbuildings, or barns can be "erected, altered, or placed on property" in Falcon Wood. Following such approval, the Restrictions require that "[a]ny building, structure or improvement commenced on any tract shall be completed as to exterior finish and appearance within six (6) months from the commencement date." Until construction is completed, the Restrictions also limit property owners' rights to keep or occupy campers, recreational vehicles (RVs), or tents on their land. In relevant part, the Restrictions state:

- "Prior to construction of a dwelling, an occupied, self-contained camper or recreation vehicle may be kept on the property no longer than 14 consecutive days out of a 30 day period."

- "During the construction of a dwelling, a camper or recreation vehicle may be kept on the property for up to six (6) months, so long as said camper or recreation vehicle is hooked up to an approved septic system." The six-month period corresponds to the six-month deadline for completing construction of the dwelling.

- "Occupied, non self-contained campers and tent camping will also be permitted on the property for no longer than seven (7) consecutive days out of a 30 day period. All non self-contained campers and tent campers must provide some type of chemical toilet for their campsite."

- "Prior to construction of a dwelling, un-occupied campers, recreation vehicles and tents must be removed from the property when not in use."[1]

Appellant Hicks purchased two adjacent Falcon Wood lots during the fall of 2006. There is no dispute that she received a copy of the Restrictions at that time.[2] Hicks made plans

---

[1] This portion of the Restrictions also imposes set-back restrictions on the location of "campers, recreation vehicles, and campsites" and requires that they "be kept in a clean and tidy manner at all times." These regulations are not at issue in this proceeding.

[2] Hicks likewise acknowledged that a "Falcon Wood" sign at the subdivision's entrance indicates "Deed Restrictions Enforced."

to construct a two-story log house on her property. In 2007, it is undisputed that Hicks submitted her plans and specifications for her new house to the Architectural Control Committee, as the Restrictions required. The plans were approved.

In the meantime, Hicks ended up closing on the sale of her existing residence in San Marcos before construction was to begin on her new house in Falcon Wood. Searching for a "solution" for the interim period in which she would lack a permanent residence, Hicks inquired with the FWPOA leadership as to whether she could live on her property in an RV and comply with the Restrictions' prohibition against keeping "an occupied, self-contained camper or recreation vehicle . . . on the property . . . longer than 14 consecutive days out of a 30 day period" by moving her RV back and forth between each of her two adjacent lots every 14 days. She was informed that she could not do so, based on the FWPOA board's "interpretation" of the Restrictions. Over the ensuing months, the board, for whatever reason, reminded Hicks several times, in writing or orally, that the Restrictions restricted her rights to live on her property in an RV.

On June 27, 2007, Hicks filed paperwork that began the process for her to obtain a permit for her house's septic system from the Hays County Environmental Health Department. On July 25, Hicks's plans for her house's septic system were approved by the county and Hicks obtained a permit for its installation. Construction of Hicks's house began on August 18, 2007. This event, the parties agree, triggered the Restrictions' six-month requirement for Hicks to complete construction "as to exterior finish and appearance" and made the deadline February 18, 2008. Hicks testified that she served as her own general contractor and thus was on the property "a lot" during construction, typically arriving in the early mornings, around the same time as the workers.

4

Excavation for the house's septic system began in August, shortly after work on the foundation began, with the expectation that work would be completed in September. During the following Labor Day weekend, on or about the evening of August 31, Hicks moved an RV (initially driving, but ultimately having to tow it) from San Marcos to her Falcon Wood property. The RV had an on-board toilet, a sink, and a shower, running water, and a storage tank to contain wastewater generated by the toilet, sink, and shower. There is no dispute that this RV was "self-contained" as that term is used in the Restrictions.

The installation of the septic system for Hicks's house encountered a major setback when excavators hit a cave. It was later determined by a geologist that the area around Hicks's home contained numerous caves. Matters were further complicated by the fact that Falcon Wood is located over the environmentally sensitive Edwards Aquifer. Amid these challenges, Hicks ultimately had to obtain a new design and location for her septic system. There was also evidence that disputes between Hicks and her contractors may have contributed to delays in getting her septic system installed.

Around September 24, two members of the FWPOA board of directors came onto Hicks's property (traveling what witnesses indicated was approximately the length of a city block from the public right-of-way to Hicks's home site) to "inspect" the site.[3] They informed Hicks

[3] The Restrictions authorize FWPOA to "perform inspections to assist the [Architectural Control] Committee" and to enter property to enforce the Restrictions "after notice and hearing (unless a bona fide emergency exists in which event this entry may be exercised without notice (written or oral) to the Owner in such manner as to avoid any unreasonable or unnecessary interference with the lawful possession, use or enjoyment situated thereon by the Owner or any other person)." The evidence does not indicate whether or how the FWPOA board members attempted to comply with the Restrictions in making this or any other apparently uninvited incursions onto Hicks's property.

that she could not live on the property in her RV because the Restrictions required the RV to be connected to the house's septic system (which, of course, had not been constructed yet). Hicks informed her visitors about the problems she had encountered with the septic system installation. Also, according to one of the board members who testified, Hicks expressed the view that she was in compliance with the Restrictions because she had a porta-potty. Hicks later testified at trial that she never used the toilet in her RV during construction, opting instead for a porta-potty that was located on the site, and tried to minimize generation of wastewater by rarely taking showers in the RV and eating take-out meals rather than cooking and doing dishes. She added that the company that periodically serviced the porta-potty also serviced her RV (i.e., emptying or cleaning out the wastewater storage tank). Hicks—a single mom to a six year-old—also presented evidence that she slept overnight in the RV only on "some nights" during construction and instead frequently spent nights in motels or with friends.

Subsequently, during a meeting in mid-October, the FWPOA board voted to grant Hicks a two-week "variance" allowing her to keep her RV on her property without it being connected to her house's septic system. The "variance" was to expire after November 3. By this time, the evidence reflected, the relationship between the FWPOA board and Hicks had become strained, stemming in part from personality conflicts.[4]

---

[4] In addition to emphasizing examples of what board members regarded as Hicks's abrasive behavior and her unwillingness to follow the rules, FWPOA took pains to highlight for the jury a supposed comment by Hicks in which she indicated that she had once lived in *New York*. Hicks, for her part, emphasized what she regarded as the FWPOA board's obstinate, petty, and high-handed overreaching of its authority under the Restrictions. Whatever the truth regarding these matters might actually have been, it is apparent that relations among these neighbors were becoming less than neighborly.

Hicks, with her young daughter, appeared at a November 1 board meeting, expressed exasperation at her continuing problems with her septic system, and explained that she would be unable to complete installation of her septic system before November 3. The board refused to grant Hicks any additional "variances" or extensions. At some point during the meeting, tempers flared and Hicks, according to FWPOA witnesses, indicated that she could or would not move her RV off her property and invited the board to sue her. On the following day, two FWPOA board members returned to Hicks's property to "inspect" the septic system problems Hicks had mentioned the preceding evening. Hicks called 911, threatened to have the board members arrested for trespassing, and escorted them off her property.

On November 13, 2007, FWPOA filed suit against Hicks, alleging that "[s]ince November 4, 2007 [the date after the 'variance' expired], Denise Hicks has been in violation of the applicable deed restrictions related to living on the properties without an approved septic system and by residing in a recreational vehicle on the properties." FWPOA sought temporary and permanent injunctive relief barring Hicks from "residing in a recreational vehicle located on the property" and "residing on the property in any way until an approved septic system is installed on the property," statutory damages of $200 per day for each day of violations,[5] and attorney's fees. Following a hearing, on December 12, the district court granted a temporary injunction compelling Hicks to "remove her recreational vehicle and cease to reside on [her two lots] until such time as there is a working, county approved septic system in place on the property." Hicks filed a mandamus petition

---

[5] *See* Tex. Prop. Code Ann. § 202.004(c) (West 2007) ("A court may assess civil damages for the violation of a restrictive covenant in an amount not to exceed $200 for each day of the violation.").

that prompted this Court to stay the temporary injunction and request a response.[6]  While Hicks's mandamus petition was pending, the district court amended the temporary injunction twice.  We ultimately denied mandamus relief on March 27, 2008.

In the meantime, Hicks had obtained another permit to install her septic system on December 19, 2007.  During the following weeks, the system was installed, inspected, and approved by Hays County.  Although there was evidence that the system had been approved as early as February 7, 2008, it wasn't until March 17 that Hays County issued its formal written approval.

On or shortly after February 18, 2008—the expiration of the six-month completion-of-construction deadline—two FWPOA board members, this time with Hicks's approval, entered Hicks's property to "inspect" the construction.  There is no dispute that the exterior structure of the house was complete by this time—the walls were up, the roof was on, and windows and doors had been installed.  Both board members complained, however, that the house's garage, which was part of the first floor structure, had exposed cinder-block walls.  In their assessment, the walls appeared "unfinished."[7]  There was evidence that during this conversation, Hicks indicated that she would be applying stucco to the garage walls, but that the weather had been too cold for proper application.  However, Hicks did not apply stucco to the garage walls thereafter.  In May, one of the board members wrote Hicks and advised her that she still had "not completed the exterior of your home as you agreed" and that Hicks was, therefore, in violation of the Restrictions' six-month deadline to complete construction.  The letter also accused Hicks of violating a Restriction

---

[6]  Cause No. 03-07-00721-CV, *In re Denise Hicks*.  Hicks was pro se at the time.

[7]  One of the board members also complained that the walls looked "unfinished" because Hicks had not applied "color" to the logs.  That complaint is not at issue on appeal.

8

prohibition against "junk motor vehicles"—namely, Hicks's RV—explaining that "[a]n old inoperable motor home of that vintage is in our opinion a junk motor home and must be removed from your property."

The case went to trial beginning January 6, 2009.[8] In the interim, it is undisputed that Hicks had not removed her RV from her property, nor had she applied stucco to her garage walls as the FWPOA board had demanded. Following the presentation of evidence, the district court submitted, over objections, whether Hicks violated the Restrictions in any of five different ways:

• "by, prior to the construction of a dwelling, keeping an occupied, self-contained camper or recreational[9] vehicle on the property longer than 14 consecutive days out of a 30 day period" (Question 1).

• "by keeping a camper or recreation vehicle on the property during construction for more than 6 months, without said camper or recreation vehicle being hooked up to an approved septic system" (Question 3).

• "by keeping a camper or recreational vehicle on the property without an approved septic system" (Question 5).

• "by failing to complete a structure or improvement as to exterior finish and appearance within 6 months from the commencement of construction" (Question 7).

• "by using [her property] as a depository for an abandoned or junked motor vehicle[]" (Question 9).

As to any of these issues on which the jury returned an affirmative finding, the jury was to determine the "period of time" in which Hicks committed the violation, identifying a beginning and

---

[8] By then, Hicks was represented by counsel.

[9] The jury charge used both "recreation vehicle" (the term used in the Restrictions) and "recreational vehicle."

9

ending date.  Finally, predicated on an affirmative finding as to any of the alleged violations, the district court submitted an issue inquiring as to the amount of FWPOA's reasonable and necessary attorney's fees.

The jury found that FWPOA did not meet its burden to prove that Hicks kept "an unoccupied, self-contained camper or recreational vehicle on the property longer than 14 consecutive days out of a 30 day period" prior to construction or that she had used her property "as a depository for an abandoned or junked motor vehicle[]."  However, it found that Hicks had committed the other three violations.  As for the periods in which she committed these violations, the jury found that Hicks had kept "a camper or recreation vehicle on the property during construction for more than 6 months, without said camper or recreation vehicle being hooked up to an approved septic system" beginning not later than February 19, 2008 (the date after the six-month deadline for completing construction expired) and ending not earlier than January 8, 2009 (the date of the jury's verdict).  The jury also found that Hicks had failed "to complete a structure or improvement as to exterior finish and appearance within 6 months from the commencement of construction" during the same period.  The jury further found that Hicks "ke[pt] a camper or recreation vehicle on the property without an approved septic system" beginning not later than November 4, 2007 (the date after the "variance" ended) and ending not earlier than March 17, 2008 (the date of Hays County's formal written approval of Hicks's septic system).

Hicks moved the district court to disregard the jury's findings in Questions 3, 5, and 7, the corresponding dates-of-violation findings, and the attorney's fees finding.  The district court instead rendered judgment on the verdict.  Based on the jury's findings, it determined that Hicks

10

had violated the Restrictions for a total of 754 days. This figure corresponds roughly[10] to the sum of (1) the number of days Hicks was found to have violated the six-month construction deadline (i.e., February 19, 2008 to January 8, 2009, or 324 days); plus (2) the number of days in which Hicks was found to have violated one or both of the Restrictions related to having her RV on the property (i.e., November 4, 2007 to January 8, 2009, or 431 days).[11] The district court then multiplied the 754 days times the maximum $200 per day in statutory damages[12] to yield $150,800, and rendered judgment awarding that amount to FWPOA. Further, based on the jury's findings that Hicks had failed to complete construction as of trial, the district court awarded permanent injunctive relief compelling Hicks, within 90 days of the judgment, "to complete the exterior construction of her dwelling." Finally, the district court awarded FWPOA $11,287 in attorney's fees found by the jury.

After a motion for new trial was denied by operation of law, Hicks appealed the judgment.

---

[10] The calculations that follow yield a total of 755 days, a one-day discrepancy.

[11] Alternatively, because the jury found that Hicks violated both the six-month construction deadline and the prohibition against keeping her RV "on the property during construction for more than 6 months, without said camper or recreation vehicle being hooked up to an approved septic system" during the same 324-day period (February 19, 2008 through January 8, 2009), the same sum results by adding (1) the number of days Hicks violated either or both the six-month construction deadline and/or kept her RV "on the property without an approved septic system" (November 4, 2007 to January 8, 2009, or 431 days) and (2) the number of days Hicks was found to have kept her RV "on the property during construction for more than 6 months, without said camper or recreation vehicle being hooked up to an approved septic system" (February 19, 2008 to January 8, 2009, or 324 days).

[12] *See* Tex. Prop. Code Ann. § 202.004(c). As Hicks observes, this resulted in a total award of $400 per day during the period between February 19, 2008 through January 8, 2009.

## ANALYSIS

Hicks brings three issues on appeal. In her first issue, she challenges the district court's judgment awarding relief based on jury findings that she kept an RV on her property "without an approved septic system" or "without . . . being hooked up to an approved septic system." In her second issue, Hicks complains of the judgment awarding monetary and injunctive relief for her "failing to complete" her house "as to exterior finish and appearance." Assuming we sustain either or both of these issues, Hicks argues in her third issue that we should reverse the award of attorney's fees to FWPOA.

**Standard of review**

Several of Hicks's appellate complaints turn on construction of the Restrictions. During trial, some of the FWPOA officers who testified expressed the view that the association's board of directors have discretion to "interpret" the Restrictions as they see fit to "benefit the community." Whatever value the goal of "benefitting the community" might have when resolving land-use disputes through neighborly diplomacy, if courts end up getting involved, we must construe restrictive covenants according to contract-law principles. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998); *Owens v. Ousey*, 241 S.W.3d 124, 129 (Tex. App.—Austin 2007, pet. denied). We construe restrictive covenants as a whole in light of the circumstances at the time they were enacted, giving effect to every sentence, clause, and word of a covenant, and avoiding constructions that would render parts of the covenant superfluous or inoperative. *Pilarcik*, 966 S.W.2d at 478; *Owens*, 241 S.W.3d at 129. Our primary concern is to ascertain and give effect to the true intention of the drafters as expressed in the covenants. *See Gulf Ins. Co. v. Burns Motors*, 22 S.W.3d 417, 424

12

(Tex. 2000); *Owens*, 241 S.W.3d at 129. We focus not on the drafters' subjective intent, but on their objective intent, as it is reflected in the written covenants. *See Lopez v. Munoz, Hockema & Reed*, 22 S.W.3d 857, 861 (Tex. 2000); *Tien Tao Ass'n v. Kingsbridge Park Cmty. Ass'n*, 953 S.W.2d 525, 528 (Tex. App.—Houston [1st Dist.] 1997, no pet.); *Travis Heights Improvement Ass'n v. Small*, 662 S.W.2d 406, 410 (Tex. App.—Austin 1983, no writ). When terms are defined, those definitions control our construction of the covenants. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 219 (Tex. 2003). If terms are not defined, they "are given their plain, ordinary, and generally accepted meanings" unless the instrument itself shows them to be used in a technical or different sense. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). Construction of restrictive covenants—and whether particular facts constitute a violation—presents a question of law, which we review de novo. *Owens*, 241 S.W.3d at 129; *Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 705 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

If a restrictive covenant has a definite or certain meaning, it is unambiguous as a matter of law and it should be construed liberally to effectuate the parties' intent. Tex. Prop. Code Ann. § 202.003 (West 2007); *Pilarcik*, 966 S.W.2d at 478; *Owens*, 241 S.W.3d at 129. However, to say that an unambiguous restrictive covenant is to be "liberally construed" does not mean that it necessarily restricts the land use in dispute—the covenant, properly construed, may unambiguously state otherwise. *See Owens*, 241 S.W.3d at 130 (restrictive covenant provisions authorizing amendments or extensions could not be "liberally construed" to permit amendments or extensions after expiration of express 25-year term). Also, if the covenant is ambiguous (i.e., subject to

13

more than one reasonable interpretation), doubts are to be resolved in favor of the free and unrestricted use of the property, and any ambiguity must be strictly construed against the party seeking to enforce it. *Wilmoth v. Wilcox*, 734 S.W.2d 656, 657 (Tex. 1987). A party seeking to enforce a restrictive covenant has the burden of proof at trial to show that the restrictions are valid and enforceable. *Gillebaard v. Bayview Acres Ass'n*, 263 S.W.3d 342, 347 (Tex. App—Houston [1st Dist.] 2007, pet. denied).

Hicks also challenges the sufficiency of the evidence supporting some of the jury's findings underlying the judgment. When a party is challenging the legal sufficiency of the evidence supporting an adverse finding on an issue on which an opposing party has the burden of proof, it prevails if the record shows any one of the following: (1) there is no evidence supporting a vital fact, (2) the evidence offered to prove a vital fact is no more than a mere scintilla, (3) the evidence conclusively establishes the opposite of the vital fact, or (4) the court is barred by law or the rules of evidence from considering the only evidence offered to prove the vital fact. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994). If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182 (Tex. 1995). Conversely, evidence conclusively establishes a vital fact when the evidence is such that reasonable people could not disagree in their conclusions. *City of Keller*, 168 S.W.3d at 814-17.

When conducting a legal-sufficiency review, we must view the evidence in the light most favorable to the trial court's findings, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller*, 168 S.W.3d at 807. Moreover, we must indulge every reasonable inference that would support the district court's findings. *Id.* at 822. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827.

When a party challenges the factual sufficiency of the evidence supporting an adverse finding on which the opposing party had the burden of proof, we should set aside the finding only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the finding should be set aside. *See id.*; *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

**Construction deadline**

In her second issue, Hicks urges that the jury's finding in Question 7 that she "fail[ed] to complete a structure or improvement as to exterior finish and appearance within 6 months from the commencement of construction" and its finding in Question 8 as to the duration of that violation should have been disregarded. Question 7 tracks the Restrictions' requirement that "[a]ny building, structure or improvement commenced on any tract shall be completed as to exterior finish and appearance within six (6) months from the commencement date." Hicks asserts that the evidence

15

is legally and factually insufficient to support a finding that she committed any conduct constituting a violation of this requirement, assuming it is properly construed.[13]  We agree.

The Restrictions do not define the phrase "completed as to exterior finish and appearance" in the six-month deadline provision.  However, as Hicks observes, we may obtain guidance as to its meaning by examining other provisions of the Restrictions.  *See Pilarcik*, 966 S.W.2d at 478; *Owens*, 241 S.W.3d at 129.  As previously noted, the Restrictions require "[a]ll dwellings, detached garages, work shops, and barns" to be "approved in writing by the Architectural Control Committee prior to being erected, altered, or placed on property."  Article IV of the Restrictions, which specifically addresses the duties and powers of the Architectural Control Committee,[14] contains the following corresponding provision:

> No building or other improvement of any character shall be erected or placed, or the erection or placing thereof commenced or changes made in the design or exterior appearance thereof (excluding without limitation, painting, staining or siding), or any addition or exterior alteration made thereof after original construct[ion], on any Tract of the Subdivision until the obtaining of the necessary approval (as hereinafter provided) from the Committee of the construction plans and specifications for the construction or alteration of such improvements or demolition or destruction of existing improvements by voluntary action.  Approval shall be granted or withheld based on matters of compliance with the provisions of this instrument.

---

[13] Hicks also points out that FWPOA never amended its original petition, which complained only of the RV-related violations, to allege violations of the six-month completion-of-construction requirement.  We need not address the implications of this pleading omission or whether Hicks preserved her complaint at trial because we conclude Hicks prevails on her no-evidence ground.

[14] The land-use restrictions directly at issue are each contained in Article III of the Restrictions.

16

Succeeding provisions of Article IV require that property owners submit copies of the "plans and specifications for all proposed construction (initial or alteration) to be done . . . including plot plans showing location on the tract," mandate that the Committee's express approval or disapproval "shall be in writing," provide for deemed approval of plans and specifications approved if the Committee fails to act within 30 days, and permit the Committee to grant certain variances. Article IV also provides that the granting of Committee approval (whether in writing or through deemed approval) "shall constitute only an expression of opinion by the Committee" that the Restrictions "shall be complied with if the building and/or other improvements are erected in accordance with said plans and specifications and plot plan" and that such approval would not constitute waiver or estoppel as to any Restriction requirements "in the event that such building and/or improvements are not constructed in accordance with such plans and specifications but . . . fail to comply with the provisions hereof."

Two features of the foregoing provisions inform the meaning of "completed as to exterior finish and appearance." First, Article IV reflects a two-stage process to ensure that new buildings, other improvements, or "addition[s] or exterior alteration[s] made thereto" located on Falcon Wood properties comply with the Restrictions: (1) proposed projects must be approved in advance by the Architectural Control Committee, which scrutinizes the submitted plans and specifications for the project and grants or withholds approval "based on matters of compliance with" the Restrictions; (2) the project, as ultimately constructed, must be "in accordance with said plans and specifications and plot plan" that were submitted to and approved by the Committee. Considered in the context of these provisions, the phrase "*completed* as to exterior finish

17

and appearance" in the six-month deadline provision contemplates completion of the exterior construction in accordance with the plans and specifications that have been approved by the Committee.

The second feature of Article IV that is instructive is its exclusion of "without limitation, painting, staining, or siding" from the types of "changes made in the design or exterior appearance" of "buildings or other improvements" during construction that require Architectural Control Committee approval. Article IV, in other words, permits property owners to change the "painting, staining, or siding" of "buildings or other improvements" originally called for in their approved plans and specifications without obtaining Architectural Control Committee approval.

Informed by the provisions in Article IV, we conclude that "[a]ny building, structure or improvement commenced on any tract shall be completed as to exterior finish and appearance within six (6) months from the commencement date" unambiguously required only that Hicks complete her house's exterior construction in accordance with the plans and specifications that the Architectural Control Committee had previously approved. Moreover, even assuming that Hicks's approved plans and specifications had called for a specific type or color of "painting, staining, or siding," Hicks was permitted to change those features without Committee approval. In the alternative, we hold these are reasonable constructions of the Restrictions that would give rise to an ambiguity, in which case we would construe the ambiguity strictly against the FWPOA and in favor of Hicks's free and unrestricted rights to use and enjoy her property. *See Wilmoth*, 734 S.W.2d at 657.

Applying this construction of the provision, there is no evidence that Hicks failed to "complete" construction on her home "as to exterior finish and appearance" before the six-month completion-of-construction deadline of February 19, 2008. There is no contention that Hicks's construction as of that date had deviated from or was incomplete with respect to the plans and specifications that had been approved by the Architectural Control Committee. Moreover, the sole evidence of "unfinished" construction presented by FWPOA is in the nature of "painting, staining, or siding." In support of its claim, FWPOA presented testimony of its board members complaining that Hicks had failed to apply stucco to her garage walls. FWPOA also introduced photographs of Hicks's house. Emphasizing the photographs, FWPOA in essence urged jurors to find that Hicks had failed to "complete" construction based on their subjective views as to whether her garage walls appeared "finished" or not. However, it is instead the legal principles of contract that define Hicks's private property rights vis-à-vis the Restrictions.

Hicks's approved plans and specifications did not require her to apply stucco to her garage (and she arguably would have been free to change those plans during construction even if they had). Nor does any other requirement of the Restrictions require Hicks to apply stucco to her house. Thus, properly construing the requirement, there is no evidence that Hicks "fail[ed] to complete a structure or improvement as to exterior finish and appearance within 6 months from the commencement of construction." Consequently, the jury's findings in Questions 7 and 8 must be disregarded and cannot be a basis for the district court's judgment awarding damages and injunctive relief. We sustain Hicks's second issue.

19

**RV on property "without an approved septic system"**

Within her first issue, Hicks argues that the jury's findings in Questions 5 and 6 are immaterial because "keeping a camper or recreational vehicle on the property without an approved septic system" is not a violation of any Restriction as a matter of law. *See Southeastern Pipeline Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999) (jury question is immaterial "when it should not have been submitted, it calls for a finding beyond the province of the jury, such as a question of law, or when it was properly submitted but has been rendered immaterial by other findings"). We again agree with Hicks.

Question 5 was based on FWPOA's view that the Restrictions prohibited "keeping a camper or recreational vehicle on the property" before the "approved septic system" is installed for the "dwelling." Leaving aside for now whether the term "approved septic system" as used in the Restrictions is limited to the septic system that is ultimately installed for the "dwelling," the act of "keeping a camper or recreational vehicle on the property" prior to the approval of the dwelling's septic system does not violate any Restriction. To the contrary, the Restrictions explicitly permit "an occupied, self-contained camper or recreation vehicle" to be "kept on the property" up to 14 days out of a 30-day period even before construction of the dwelling beings. The Restrictions further allow "[o]ccupied, non self-contained campers and tent camping," with only "some type of chemical toilet for their campsite," up to 7 consecutive days out of a 30-day period. These express authorizations would be entirely without effect if the Restrictions could somehow be construed to prohibit "keeping a camper or recreational vehicle on the property" before the dwelling's septic system is installed and approved. We must construe the Restrictions to give effect to every

20

sentence, clause, and word of a covenant and avoid constructions that would render parts of the covenant superfluous or inoperative. *Pilarcik*, 966 S.W.2d at 478; *Owens*, 241 S.W.3d at 129. Consequently, we must reject the construction of the Restrictions that underlies Question 5.

The construction advocated by FWPOA finds no textual support in the Restrictions. FWPOA apparently derived its view that the Restrictions prohibited Hicks from moving her RV onto her property before her home's septic system was installed from the Restrictions' requirement that "[a]ll *dwellings* . . . must be equipped with septic tank or other sewage disposal system meeting all applicable laws, rules, standards, and specifications" (emphasis added). Construing the Restrictions as a whole, however, a "dwelling" refers to the "one dwelling unit" that is permitted on each property—i.e, the structure with at least 1600 square feet of living space, built of "new construction materials," and having a concrete or pier and beam foundation. "Dwellings" under the Restrictions are plainly distinguished from "campers" and "recreation vehicles."

FWPOA has also seemed to rely upon a broad interpretation of the proviso that "[d]uring the construction of a dwelling, a camper or recreation vehicle may be kept on the property for up to six (6) months, so long as said camper and recreation vehicle is hooked up to an approved septic system." However, whether Hicks violated that provision is not the issue that was submitted in Question 5. Question 5 instead inquired as to whether Hicks had violated the Restrictions by "keeping a camper or recreational vehicle on the property without an approved septic system." That conduct, in itself, does not violate the Restrictions.

Because "keeping a camper or recreational vehicle on the property without an approved septic system" is not conduct that violates the Restrictions, the jury's finding in

21

Question 5 that Hicks had engaged in that conduct and its finding in Question 6 that Hicks had done so from November 4, 2007 through March 18, 2008 are immaterial and cannot be a basis for the district court's judgment.

**RV not "hooked up" to "an approved septic system"**

The foregoing holdings leave only the jury's findings in Questions 3 and 4 as a possible basis for an award of statutory damages and attorney's fees to FWPOA.[15]  Unlike Question 5, Question 3 tracked a provision that is actually contained in the Restrictions—the proviso that "[d]uring the construction of a dwelling, a camper or recreation vehicle may be kept on the property for up to six (6) months, so long as said camper or recreation vehicle is hooked up to an approved septic system."  Question 3 inquired, in a single issue, whether Hicks had violated this requirement in both of two ways: "[1] keeping a camper or recreation vehicle on the property during construction for more than 6 months, [2] without said camper or recreation vehicle being hooked up to an approved septic system."  Question 4, in turn, asked the jury to determine the beginning and ending date of any violation it found in Question 3.  The jury, as noted, found that Hicks had engaged in the conduct beginning on February 19, 2008, the date after the six-month completion-of-construction deadline expired, through January 8, 2009, the date of the jury's verdict.

---

[15]  The foregoing holdings also eliminate any overlapping daily violations that could have supported the district court's award of a total of $400 per day in statutory damages between February 19, 2008 and January 8, 2009.  For this reason—and because we ultimately hold that FWPOA is not entitled to any daily statutory damages from Hicks—we need not reach a contention by Hicks that the $400 per day total awards exceeded the statutory maximum.

For the same reason there is no evidence to support the jury's finding that Hicks violated the six-month completion-of-construction deadline, there is no evidence to support the jury's finding within Question 3 that Hicks "ke[pt] a camper or recreation vehicle on the property *during construction for more than 6 months*, without said camper or recreation vehicle being hooked up to an approved septic system," or did so during the period the jury found in Question 4. "During construction" necessarily refers to the erection of the "building, structure or improvement" that must be "completed as to exterior finish and appearance within six (6) months from the commencement date," as further confirmed by the fact that the six-month limitation on keeping the camper or RV on the property "during construction" corresponds to the six-month completion-of-construction deadline. Consequently, because there is no evidence that construction of Hicks's house was not "completed as to exterior finish and appearance within six (6) months from the commencement date," Hicks could not possibly have kept her RV on the property "during construction for more than 6 months."

However, the jury's affirmative finding in Question 3 necessarily rested upon a subsidiary finding that Hicks "ke[pt] a camper or recreation vehicle on the property . . . without said camper or recreation vehicle being hooked up to an approved septic system" for however long construction lasted within the six-month period. There is no dispute that Hicks's RV remained on her property from August 31, 2007 (and from November 4, 2007, the date the FWPOA's "variance" ended) through the time of trial. Thus, Hicks undisputedly "kept" her RV on the property throughout the construction period. As the evidence does not conclusively establish the date prior to February 18, 2008 on which Hicks's construction was completed, a new trial on that issue would be

23

required if the evidence supports a finding that Hicks "kept" her RV on the property during this period "without said [RV] being hooked up to an approved septic system."

Within her first issue, Hicks argues that there is no evidence she violated the requirement that her RV be "hooked up to an approved septic system," assuming that requirement is properly construed. In the alternative, Hicks urges that this requirement applies only to occupied, self-contained RVs, and that the evidence is legally and factually insufficient to support a finding that she "occupied" her RV, in the sense of staying there overnight, on anything more than a sporadic or occasional basis.

The Restrictions do not explicitly define either "approved septic system" or what it means for a "camper or recreation vehicle" to be "hooked up" to such a system. Some guidance can be obtained from the context in which these provisions appear. As previously noted, the Restrictions impose several limitations on the rights of Falcon Wood property owners to keep or occupy campers, RVs, or tents on their property before construction of their dwelling is completed. "Prior to construction of a dwelling," the Restrictions provide, "an occupied, self-contained camper or recreation vehicle may be kept on the property no longer than 14 consecutive days out of a 30 day period." Immediately following this provision is the provision at issue—"During the construction of a dwelling, a camper or recreation vehicle may be kept on the property for up to six (6) months, so long as said camper or recreation vehicle is hooked up to an approved septic system." Next are provisions addressed to occupied, non-self-contained campers and tent camping—"Occupied, non self-contained campers and tent camping will also be permitted on the property for no longer than seven (7) consecutive days out of a 30 day period. All non self-contained campers and

24

tent campers must provide some type of chemical toilet for their campsite."—and a requirement addressed to unoccupied campers, RVs, and tents—"Prior to construction of a dwelling, un-occupied campers, recreation vehicles and tents must be removed from the property when not in use."

As Hicks observes, the context implies that the "camper or recreation vehicle" that "may be kept on the property for up to six (6) months, so long as said camper or recreation vehicle is hooked up to an approved septic system" is "self-contained"—i.e., has its own wastewater storage capability—because the next sentence imposes a different limitation on "non self-contained" campers both prior to and during construction. Also, as Hicks seems to acknowledge, the phrase "*hooked up to* an approved septic system" denotes being connected to "an approved septic system" that is external to the self-contained camper or RV—i.e., one that the camper or RV's on-board wastewater retention system is emptied or dumped into—and cannot be construed as a reference to the camper or RV's own wastewater retention system.

The Restrictions, as noted, require that all "dwellings" placed or constructed in Falcon Wood "be equipped with septic tank or other sewage-disposal system meeting all applicable laws, rules, standards and specifications." From this, FWPOA reasons that the "approved septic system" to which Hicks's RV was required to be "hooked up" meant the same septic system that she was constructing for her dwelling. While the "septic tank or other sewage disposal system meeting all applicable laws, rules, standards and specifications" required for a dwelling would seem to suffice as "an approved septic system" by any reasonable definition, we cannot agree that the Restrictions reflect an intent to limit "an approved septic system" solely to the dwelling's "approved septic system." The Restrictions contain no requirement of that sort (e.g., a requirement

25

that the RV be "hooked up" to "the approved septic system for the dwelling") or even a term of limitation like "*the* approved septic system" instead of the open-ended "*an* approved septic system" that the drafters used. Nor, as Hicks points out, do the Restrictions specify or require that the RV must be *continuously* "hooked up" or connected to "an approved septic system."

The evident purpose of the requirement that a self-contained RV be "hooked up to an approved septic system," especially when considered in context with the requirements addressed to non-self-contained campers and tents, is to ensure that the property owner disposes of any wastewater from his self-contained camper or RV in a manner that is legally authorized or approved. There is no evidence that Hicks failed to comply with this requirement. The evidence was undisputed that the same company that periodically serviced or cleaned out Hicks's porta-potty likewise serviced Hicks's RV. There was no contention that the company's system of waste removal was not legally authorized or approved. Consequently, there is no evidence to support any finding that Hicks "ke[pt] a camper or recreation vehicle on the property during construction . . . without said camper or recreation vehicle being hooked up to an approved septic system." We sustain Hicks's first issue.

**Attorney's fees**

Because the foregoing holdings mean that FWPOA does not prevail on any of its claims, we likewise sustain Hicks's third issue, which challenges the judgment's award of attorney's fees to FWPOA as a prevailing party.

26

**CONCLUSION**

Having sustained each of Hicks's three issues on appeal, we reverse the district court's judgment and render judgment that FWPOA take nothing on its claims.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Reversed and Rendered

Filed:   August 19, 2010